\

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 0 7 2000

Michael N. Milby
Clerk of Court

JESUS GARZA, et al.           :

         Plaintiffs,        :

vs.                   :

PLANTATION SWEETS, INC.,   :

         Defendant.      :

                              :

CIVIL ACTION NO.  B-00-056

JURY

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

> To require [migrant farm workers] to prosecute an action in a distant district where a breach of the agreement occurs, rather than where the agreement was entered into and where performance began, would impose upon Plaintiffs an intolerable financial burden, chilling their desires to vindicate statutorily created rights, if not effectively destroying their ability to do so. <u>Gurrola v. Griffin & Brand Sales Agency</u>, 524 F. Supp. 115, 117 (S.D. Tex. 1980).

### INTRODUCTION

Plaintiffs brought this action against Defendant for violations of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801 <u>et seq.</u>, (AWPA) and the Fair Labor Standards Act, 29 U.S.C. §§ 201 <u>et seq.</u>, (FLSA).  Defendant has moved to dismiss this action, contending that this Court lacks personal jurisdiction over them and that venue is not proper in the Southern District of Texas.  Plaintiffs oppose the Defendant's motion and request that the Court deny it.  In their motion, the Defendant states that it was not subject to personal jurisdiction in the State of Texas.  Without any legal argument whatsoever, the Defendant references the Court to an affidavit from the Defendant corporation's President Ronald A. Collins.  But the Collins affidavit merely

CithPDF - www.fasio.com

states that the Defendant is a corporation organized in Georgia, does not have a place of business in Georgia, and is not licensed to do business in Texas.[1]

This Court has jurisdiction because Defendant purposefully established minimum contacts with Texas by recruiting Plaintiffs in Texas through its agent Arturo Muñoz, and because many of the statutory violations alleged occurred in whole or in part in Texas, during the course of Defendant's recruitment of Plaintiffs. Venue is proper in the Southern District of Texas because AWPA has a special venue provision allowing farm workers to bring AWPA suits in any district court of the United States having jurisdiction of the parties. 29 U.S.C. § 1854(a). In addition, venue is proper under 28 U.S.C. § 1391(b) because many of Plaintiffs' claims arose in this judicial district.

To meet their burden of establishing personal jurisdiction and venue, Plaintiffs rely on the allegations in their Complaint and on the Affidavits of Plaintiffs Jesus Garza, Felipe Alejos, Martha Alejos, and Roberto Garza.

## FACTS

The Plaintiffs are migrant farm workers who reside in the Rio Grande Valley in Texas. (Compl. ¶¶ 6,8) Each year, they meet farm labor contractors who arrive in the Valley to recruit workers for jobs in more northern states. (J. Garza Affidavit, ¶ 5, attached hereto as Exhibit 1; R. Garza Affidavit ¶ 5, attached hereto as Exhibit 2; F. Alejos Affidavit, ¶ 5, attached hereto as Exhibit 3; M. Alejos Affidavit, ¶ 5, attached hereto as Exhibit 4) Contractors tell potential workers about the terms of the job with the particular farm, offer the job, and if the job conditions are agreeable, farm workers will accept the offer and travel north to work at that farm. (J. Garza Aff. ¶¶ 6-7;R. Garza Aff. ¶¶ 6-7) Migrant farmworkers often have to rely on what the contractors tell them about

---

[1]   Further, ¶¶ 4-5 of the Collins affidavit are legal conclusions. Plaintiffs object to them.

the jobs up north in making their decision whether to accept the offer. (F. Alejos Aff. ¶ 7; M. Alejos Aff. ¶ 7)

In March and April 1999 in Brownsville, Texas, the Plaintiffs were approached in person by Arturo Muñoz. (Compl. ¶ 16; J. Garza Aff. ¶ 8; R. Garza Aff. ¶ 8; F. Alejos Aff. ¶ 8; M. Alejos Aff. ¶ 8) He told the Plaintiffs that he was in Texas to recruit workers for Plantation Sweets, an onion farm in Georgia, and that the farm needed workers to pack their Vidalia onions. (Compl. ¶ 17; J. Garza Aff. ¶ 9; R. Garza Aff. ¶ 9; F. Alejos Aff. ¶ 8; M. Alejos Aff. ¶ 8) Muñoz told the Plaintiffs that the company had arranged for transportation from Brownsville to Georgia on a bus and that the workers would not have to pay anything, but if they wanted to drive themselves, the farm would reimburse their transportation costs. (Compl. ¶ 19(a); J. Garza Aff. ¶ 11; R. Garza Aff. ¶ 11; F. Alejos Aff. ¶¶ 11-12; M. Alejos Aff. ¶¶ 11-12) He told the Plaintiffs they would begin work upon arrival and that they would receive $5.75 per hour, and a $.25 bonus upon completion of the harvest season. (Compl. ¶ 19(b) and (c); J. Garza Aff. ¶ 10; R. Garza Aff. ¶ 10; F. Alejos Aff. ¶ 10; M. Alejos Aff. ¶ 10) Muñoz told them that they would work "a lot of hours," and that they would live in clean housing for just $5 to 6 per week, which would be deducted from their weekly wages. (J. Garza Aff. ¶ 10; R. Garza Aff. ¶ 10; F. Alejos Aff. ¶ 10; M. Alejos Aff. ¶ 10; Compl. ¶ 19(d))

Upon hearing what Muñoz had to say about the job in Georgia, the Plaintiffs told Muñoz in Texas that they would accept the job in Georgia. (J. Garza Aff. ¶ 13; R. Garza Aff. ¶ 13; F. Alejos Aff. ¶ 14; M. Alejos Aff. ¶ 14; Compl. ¶¶ 18-19, 22) Muñoz wrote their names down in a book and told them to meet at a particular place and time to get on the bus and travel together from Brownsville, Texas to Georgia. (J. Garza Aff. ¶ 13; R. Garza Aff. ¶ 13) Muñoz did not give them

anything in writing which described the terms and conditions of employment with Plantation Sweets. (Compl. ¶¶ 20-21; J. Garza Aff. ¶ 12; R. Garza Aff. ¶ 13; F. Alejos Aff. ¶ 13; M. Alejos Aff. ¶ 13)

Plaintiffs then ceased all efforts to obtain other employment, because they had accepted the job that Muñoz had offered. (Compl. ¶ 24; J. Garza Aff. ¶ 14; R. Garza Aff. ¶ 13; F. Alejos Aff. ¶ 15; M. Alejos Aff. ¶ 15) They made preparations to leave Brownsville for the season and appeared at the designated meeting place at the designated time. (Compl. ¶ 24; J. Garza. Aff. ¶¶ 14-15; R. Garza Aff. ¶¶ 14 -15; F. Alejos Aff. ¶¶ 16,18; M. Alejos Aff. ¶¶ 16,18) All the Plaintiffs, those who rode on the bus and those who drove themselves, met at the parking lot with Muñoz. (J. Garza Aff. ¶¶ 16-18; R. Garza Aff. ¶¶ 16-18) Muñoz gave the Plaintiffs who did not travel on the bus directions to the farm in Georgia and wrote down "Plantation Sweets" and "Ronnie Collins." (F. Alejos Aff. ¶ 20; M. Alejos Aff. ¶ 20) The Plaintiffs who rode the bus waited around for about two hours while Muñoz waited for something from Plantation Sweets to arrive. (J. Garza Aff. ¶ 17) After Muñoz finished making the arrangements, a bus from the "El Expreso" bus line, based in Brownsville, Texas, arrived. (J. Garza Aff. ¶¶ 18-19; R. Garza Aff. ¶ 19) Plaintiffs did not pay to ride the bus, but they were given a receipt for $75 upon boarding. (J. Garza Aff. ¶ 18; R. Garza Aff. ¶ 18) When the bus arrived in Georgia the next day, the driver stopped at a gas station and made a phone call. (J. Garza Aff. ¶ 22; R. Garza Aff. ¶ 22) Someone then arrived and the bus followed this person to the Plantation Sweets packing shed. (J. Garza Aff. ¶ 22; R. Garza Aff. ¶ 22) When the bus arrived at the Plantation Sweets packing shed, the bus driver met with someone there in an office. (J. Garza Aff. ¶ 23)

All the Plaintiffs, those who had ridden the bus and those who drove themselves, met at the

Plantation Sweets packing shed, where they waited in a line and registered for work. (Compl. ¶ 29; J. Garza Aff. ¶¶ 23-24; R. Garza Aff. ¶¶ 23-24; F. Alejos Aff. ¶ 22; M. Alejos Aff. ¶ 22) They were then taken to housing down the road from the packing shed and were told to wait for Muñoz. (Compl. ¶ 30; J. Garza Aff. ¶ 25; R. Garza Aff. ¶ 24; F. Alejos Aff. ¶ 23; M. Alejos Aff. ¶ 23) When Muñoz arrived, Plaintiffs were told that they would all have to spend the night in one house. (J. Garza Aff. ¶ 25; R. Garza Aff. ¶ 24; F. Alejos Aff. ¶ 24; M. Alejos Aff. ¶ 24) There was no electricity and little furniture in the house, and it was very overcrowded. (J. Garza Aff. ¶ 26; R. Garza Aff. ¶ 25; F. Alejos Aff. ¶ 26; M. Alejos Aff. ¶ 26) The housing conditions were so bad that some of the Plaintiffs spent the night in their cars or in unsanitary trailers. (Compl. ¶ 31; J. Garza Aff. ¶ 26; F. Alejos Aff. ¶¶ 27-29; M. Alejos Aff. ¶¶ 27-29) Plaintiffs who drove themselves asked him for their transportation reimbursement but he said that they would need to wait until the following day when the office opened. (F. Alejos Aff. ¶ 25; M. Alejos Aff. ¶ 25)

Work was still not available the next day, and the workers had not received a loan for food money. Some of the workers complained to the Georgia Department of Labor (Ga DOL). After some of the workers complained, they were taken to a motel in a nearby town and most of the Plaintiffs were given a loan of $50. (Compl. ¶ 32; J. Garza Aff. ¶¶ 27-28; R. Garza Aff. ¶¶ 26-27; F. Alejos Aff. ¶¶ 30-31; M. Alejos Aff. ¶¶ 30-31) Plaintiffs spent at least one night at this motel before being directed back to the Plantation Sweets housing.

Work was still not available for at least another week. (Compl. ¶¶ 35(a), 36-7; J. Garza Aff. ¶ 29; R. Garza Aff. ¶ 28) Plaintiffs who waited around for the work to begin received their first paycheck after working in the shed for one week. (J. Garza Aff. ¶ 30; R. Garza Aff. ¶ 29) They were paid at a rate of only $5.15 per hour. (Compl. ¶ 39; J. Garza Aff. ¶ 30; R. Garza Aff. ¶ 29)

Their paycheck was handwritten, drawn from the Plantation Sweets account, only seemed to cover half the week of work, did not have an itemized wage stub attached to it and had the letters "Adv." written next to the number 125 on the memo line. (J. Garza Aff. ¶¶ 31-32; R. Garza Aff. ¶ 30-31) $125 appeared to have been deducted from the Plaintiffs' gross pay. Presumably, this amount included $50 for the loan Plantation Sweets had given to them and $75 for the bus ticket that Plantation Sweets had provided. (J. Garza Aff. ¶ 32; R. Garza Aff. ¶ 31)

## ARGUMENT

I.     This Court's Exercise of Jurisdiction Over Defendants Comports With Due Process.

Because the Texas long-arm statute extends personal jurisdiction to the limits of due process, the determination of whether this Court has personal jurisdiction over the Defendant compresses into a due process assessment. Jones v. Petty-Ray Geophysical Geosource, Inc., 954 F.2d 1061, 1067 (5th Cir. 1992). To exercise personal jurisdiction consistent with due process, the Court must conclude that the Defendant established "minimum contacts" with Texas and that the exercise of personal jurisdiction would not offend "traditional notions of fair play and substantial justice." Bullion v. Gillespie, 895 F.2d 213, 216 (5th Cir. 1990) (citing Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102 (1987) and International Shoe Co. v. Washington, 326 U.S. 310 (1945)).

The minimum contacts analysis has been separated into two types of personal jurisdiction: general and specific. Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 411 n. 8-9 (1984). General jurisdiction arises where the nonresident's contacts with the forum have been "continuous and systematic." Bullion, 895 F.2d at 216. Specific jurisdiction, on which Plaintiffs rely, arises when the controversy is related to the defendant's contacts with the forum state. Helicopteros, 466 U.S. at 414. To establish specific jurisdiction, the relationship "among the defendant, the forum, and

-6-

the litigation" should be analyzed. <u>Shaffer v. Heitner</u>, 433 U.S. 186, 204 (1977). It is well settled "that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 473 (1985) (quoting <u>Travelers Health Assn. v. Virginia</u>, 339 U.S. 643, 647 (1950)). Even a single purposeful contact related to the cause of action may be sufficient to invoke specific jurisdiction, <u>Micromedia v. Automated Broadcast Controls</u>, 799 F.2d 230, 234 (5th Cir. 1986), and the nonresident defendant himself need not have set foot upon the forum's soil. <u>Bullion</u>, 895 F.2d at 216 (citing <u>Burger King</u>, 471 U.S. at 476).

A.   <u>Plaintiffs Meet Their Burden Of Proof And All Disputed Facts Must Be Viewed In The Light Most Favorable To The Plaintiffs.</u>

Plaintiffs bear the burden of establishing the district court's jurisdiction over the Defendant. <u>Thompson v. Chrysler Motors Corp.</u>, 755 F.2d 1162, 1165 (5th Cir. 1985). However, the quantum of proof required to meet that burden varies depending on the method the district court uses to determine the issue. Wright & A. Miller, Federal Practice and Procedure § 1351 at 248 (2nd ed. 1990); <u>Data Disc, Inc. v. Systems Technology Assocs., Inc.</u>, 557 F.2d 1280, 1285 (9th Cir. 1977). The district court has discretion to proceed either on affidavits and discovery materials or through a full evidentiary hearing. Moore's Federal Practice ¶ 12.07[2.-2] at 12-55 (2d ed. 1993). If the district court decides a defendant's motion to dismiss without an evidentiary hearing, a plaintiff "need only present a <u>prima facie</u> case for personal jurisdiction; proof by a preponderance of the evidence is not required." <u>D.J. Investments, Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.</u>, 754 F.2d 542, 545-46 (5th Cir. 1985). "[U]ncontroverted allegations in the plaintiff's complaint must

be taken as true," id. at 546, and "conflicts between the facts as established by the respective parties' appropriate affidavits, and other proper summary judgment type evidence,[2] must be resolved in plaintiff's favor." Jones, 954 F.2d at 1067.

If, on the other hand, the court decides to hold a full evidentiary hearing to resolve issues of credibility and disputed questions of fact, plaintiff must present evidence establishing the jurisdictional facts by a preponderance of the evidence. Moore's Federal Practice ¶ 12.07[2.-2] at 12-57 (2d ed. 1993); Data Disc, 557 F.2d at 1285. Therefore, until a trial or evidentiary hearing is held, a prima facie showing of personal jurisdiction will defeat a defendant's motion to dismiss, DeMelo v. Toche Marine, Inc., 711 F.2d 1260, 1271 n. 12 (5th Cir. 1983), and all disputed facts must be viewed in the light most favorable to plaintiff.

B.    Defendant Had Minimum Contacts With Texas.

Defendant had contact with Texas either directly or through agents during March and April 1999. The Defendant sent Arturo Muñoz to Brownsville, Texas to recruit Texas workers and chartered a bus in Texas to transport them from Texas to Georgia. In the process, the Defendant violated the Plaintiffs' rights under the AWPA.[3]

The conduct of an authorized agent binds the principal on the jurisdictional issue, just as in other issues. See, e.g., Product Promotions, Inc. v. Cousteau, 495 F.2d 483, 492 (5th Cir. 1974) ("an

---

[2]    To determine whether Plaintiffs have presented a prima facie case for personal jurisdiction, the court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." Thompson, 755 F.2d at 1165.

[3]    Among other things, Defendant's agent was not a licensed farm labor contractor; Plaintiffs were not given written disclosures which described the terms and conditions of the job with the Defendant; the information which was given to the Plaintiffs verbally was false and misleading; and the Defendant failed to comply with the work arrangement.

agency relationship may justify finding that a parent corporation 'does business' in a jurisdiction through its subsidiary's local activities"). This concept is well illustrated by the Texas long-arm statute which provides that "a nonresident does business in this state if the nonresident: . . . recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state." Tex. Civ. Prac. & Rem. Code Ann. § 17.042(3) (Vernon 1986) (emphasis added). The Defendant did exactly this; and its conduct is exactly the sort intended to be covered by the Texas long-arm statute.

The Defendant, a nonresident, presumably needed workers to harvest and pack its Vidalia onions in Georgia and sent an agent to Texas to recruit migrant farm workers for its operation. Arturo Muñoz, its agent, did go to Texas and did recruit the Plaintiffs. The Defendant promised to arrange for the workers' transportation to Georgia, and did charter the "El Expreso" bus to transport the Plaintiffs. The Plaintiffs came to know about the job, and traveled to the job site solely as a result of Defendant's affirmative acts and contacts with Texas.

C.     <u>Plaintiffs' Claims Arise Out Of And Relate To Defendant's Contacts With Texas.</u>

To satisfy the requirements of due process, Plaintiffs must assert causes of action that "arise out of or relate to" Defendant's contacts with Texas. <u>Burger King</u>, 471 U.S. at 472 (quoting <u>Helicopertos</u>, 466 U.S. at 414). In the instant case, most of the Plaintiffs' claims arose out of the Defendant's contacts in Texas and some of the Plaintiffs' claims occurred in their entirety because of Defendant's conduct in Texas. First, Plaintiffs claim that Defendant failed to provide them with a written disclosure of the terms and conditions of employment at the time of their recruitment, in violation of AWPA, 29 U.S.C. § 1821(a). This violation not only arose during Plaintiffs' recruitment in Texas, it occurred completely in Texas because Plaintiffs' recruitment ended at the

-9-

time they departed Texas for the Georgia work site. <u>Alex v. Jasper Wyman & Son</u>, 682 F. Supp. 87, 89 (D. Me. 1988) ("Congress intended the recruitment phase to end with the worker's departure from his permanent place of residence for a distant work site").

Second, Plaintiffs claim, in violation of 29 U.S.C. § 1842, that the Defendant employed Muñoz's services to recruit them in Texas despite the fact that Muñoz was not at that time registered as a farm labor contractor. As with the violation described above, this violation occurred in Texas, where the Plaintiffs were recruited by Muñoz.

Third, Plaintiffs claim that during their recruitment in Texas, the Defendant violated 29 U.S.C. § 1821(f) by providing Plaintiffs with false and misleading information concerning the terms and conditions of employment. For example, Plaintiffs claim that the Defendant falsely promised to pay them $5.75 for every hour they worked plus an added $.25 bonus upon their completion of the season, when in fact the Plaintiffs were only paid $5.15 an hour. The Defendant also falsely promised them that work would be available when they arrived, when in fact the Plaintiffs were made to wait around for over a week before the work began and they earned money. Because this false information was provided to Plaintiffs by Defendant's agent in Texas, this claim not only arose out of Defendant's contacts with Texas, but occurred while the Plaintiffs were in Texas.

Plaintiffs also claim that the Defendant violated 29 U.S.C. § 1822(c) by failing to comply with the terms of the working arrangement the Defendant made with Plaintiffs. This claim also arises from and relates to Defendant's contacts with Texas because the work agreement was made in Texas and required all parties to take certain actions in Texas.[4] The Defendant partially performed

---

[4] Among other things, the work agreement required Plaintiffs to leave their permanent places of residence in Texas and travel to Georgia, and required the Defendant to pay for Plaintiffs' transportation from Texas to Georgia.

-10-

their obligations pursuant to the agreement by chartering a bus in Texas and furnishing bus tickets to Plaintiffs in Texas.  Plaintiffs partially performed their obligations by leaving their places of residence in Texas and traveling to Georgia to work for Defendant.

Defendant took affirmative steps to recruit Plaintiffs in Texas, to convey to Plaintiffs in Texas certain promised terms of employment, and to induce Plaintiffs to come to Georgia by chartering a bus in Texas to bring Plaintiffs to their work site in Georgia.  Through these actions taken in Texas, Defendant deliberately "create[d] continuing relationships and obligations with" residents of Texas. Burger King, 471 U.S. at 473. This lawsuit is in large part about the Defendant's failure to comply with that continuing employment relationship and obligations created by the Defendant Texas. Plaintiffs' claims plainly arise out of or relate to Defendant's contacts with Texas because Defendant's actions in Texas gave rise to that relationship and obligation in the first place. The assertion of specific personal jurisdiction over Defendant is consistent with due process.

D.   The Exercise Of Personal Jurisdiction Over Defendants Would Not Offend Traditional Notions Of Fair Play And Substantial Justice.

After concluding that the Defendant purposefully established the necessary minimum contacts with Texas, the next inquiry is whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice." International Shoe, 326 U.S. at 316.  In making this determination, the Court may consider factors such as the burden on the Defendant, the forum state's interest in adjudicating the dispute, and Plaintiffs' interest in obtaining convenient and effective relief. Asahi, 480 U.S. at 113. Consideration of these factors in relation to this litigation inevitably leads to the conclusion that the assertion of personal jurisdiction by this Court is both fair and reasonable.

First, the State of Texas has expressed substantial interest in adjudicating disputes involving migrant workers by specifying in its long-arm statute that a nonresident who recruits Texas residents for employment outside the state is "doing business" in Texas and is subject to service of process under the Texas long-arm statute. Tex. Civ. Prac. & Rem. Code Ann. § 17.042(3). This interest is further reflected in the Texas Workers' Compensation Act, which allows Texans recruited or hired in the State to receive compensation for injuries that would be compensable had they occurred in Texas. Tex. Labor Code § 406.071.

Similarly, the federal courts have repeatedly recognized that migrant farm workers have a compelling interest in obtaining convenient and effective relief, finding that migrant workers should not be lightly required to pursue claims in a distant forum. Aguero v. Christopher, 481 F. Supp. 1272, 1275 (S.D. Tex. 1980) (requiring farm workers to prosecute their cases in distant forum would "seriously dilute the Congressional effort to protect migrant workers"); accord, Neizil v. Williams, 543 F. Supp. 899, 904 (M.D. Fla. 1982). Plaintiffs, low-income farm workers recruited and residing in Cameron County, Texas, would be particularly burdened if forced to pursue their action in Georgia. Defendant, on the other hand, has the resources to defend this suit in Texas and will presumably be represented by local counsel. Therefore, the assertion of personal jurisdiction by this Court is fair, reasonable, and well within the limits imposed by due process.


II.    Venue is Proper in the Southern District of Texas.

AWPA provides that "any person aggrieved by a violation of this chapter . . . may file suit in any district court of the United States having jurisdiction of the parties, . . . without regard to

-12-

citizenship of the parties." 29 U.S.C. § 1854(a). Because this Court has jurisdiction of the parties,

venue is proper with this Court. Stewart v. Woods, 730 F.Supp. 1096, 1097 (M.D. Fla. 1990)

(section 854(a) "confers venue coextensive with personal jurisdiction"); Lozano v. Gonya Farms,

Inc., No. M-89-119 (S.D. Tex. April 11, 1990) ( 29 U.S.C. § 1854(a) is a special venue statute and

is dispositive of the venue issue) (order is attached hereto as Exhibit 5). Moreover, venue is proper

in this district pursuant to 28 U.S.C. § 1391(b) because several actionable events or omissions

occurred in whole or in part in this judicial district.

CONCLUSION

Plaintiffs have met their burden of proof in establishing this Court's jurisdiction over the

Defendant. They have also demonstrated that venue is proper under two federal statutes. Therefore,

Defendant's motion to dismiss for lack of personal jurisdiction and improper venue should be

denied.

Respectfully submitted this _7th_ day of June, 2000,

Nancy J. Schivone w/ permission by Michael Holley

Nancy J. Schivone
Attorney-in-Charge for Plaintiffs
Georgia State Bar No. 629398
P.O. Box 1669
Tifton, Georgia 31793
Tel: 912-386-3566
Fax: 912-386-3588

Lisa J. Krisher
Georgia State Bar No. 429762
Phyllis J. Holmen
Georgia State Bar No. 363850
Co-Counsel for Plaintiffs

-13-

1100 Spring Street, Suite 200-A
Atlanta, Georgia 30309
Tel: 404-206-5175
Fax: 404-206-5346

_Rodolfo P. Sanchez_

Rodolfo D. Sanchez _by permission_
Co-Counsel for Plaintiffs        _Michael Holley_
Texas Bar No. 17572100
S.D. No. 12600
TEXAS RURAL LEGAL AID, INC.
300 S. Texas Blvd.
Weslaco, TX 78596
Tel: 956-968-9574
Fax.: 956-968-8823

CutePDF - www.fuwin.com

## CERTIFICATE OF SERVICE

I hereby certify this 7<u>th</u> day of June, 2000 that a true and correct copy of PLAINTIFFS'

RESPONSE TO DEFENDANTS' MOTION TO DISMISS has been duly served on Defendant

Plantation Sweets, Inc. by depositing the same in the United States Mail, with adequate postage

affixed thereto and properly addressed as follows:

> Mr. Glen A. Cheney
> Attorney at Law
> 100 Memorial Drive
> P.O. Box 1548
> Reidsville, Georgia 30453

Counsel for Plaintiffs

-15-

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JESUS GARZA, et al.                    :

   Plaintiffs,                    :  CIVIL ACTION NO.  B-00-056

          :  JURY

vs.                                    :

          :

PLANTATION SWEETS, INC.,               :

   Defendant.                    :

_____:

## DECLARATION

1. My name is Jesus Garza.  I am over 18 years of age, of sound mind, capable of making this

statement, and personally acquainted with the facts contained therein.

2. I reside in  Brownsville, Texas.

3. I have worked as a migrant farm worker for over seven  years.

4. Because I am a migrant farmworker, I often leave my residence in the Rio Grande Valley to

go up north and work in the fields.

5. Farm labor contractors often come to Brownsville to recruit workers like me to work in states

up north.

6. I often have to rely on what the farm labor contractor tells me about the job.  The employers

often make promises about the pay, and whether transportation and housing will be provided.

7. If the contractor is able to provide details about the work and provides transportation to that

farm, that makes me think that the contractor was sent by the farm to recruit people like me.

8. In April 1999, I met Arturo Muñoz in Brownsville, Texas, at the Oasis Café.

-1-



9.      When I met him in Brownsville, Texas, Muñoz offered me a job in Georgia packing Vidalia

        onions for Plantations Sweets Inc.

10.     While at the Oasis Café in Brownsville, Texas, Muñoz explained the job to me.  He told me

        that there would be work upon arrival packing Vidalia onions; pay at $5.75 per hour and a

        $.25 bonus upon completion of the season; "A lot of hours," such as ten to twelve hours per

        day, six days per week; and clean housing in trailers at $5-6 per week, to be deducted from

        wages.

11.     He also told us that there would be free transportation to the work site in Georgia from

        Brownsville, Texas, because the company had arranged for a bus to take us there and was

        providing that transportation at no cost.

12.     Muñoz did not give me anything in writing which described these conditions of the job.

13.     These conditions sounded good to me so I decided to accept the job and told Muñoz that I

        accepted the job.  I gave him my name to write on a list.  He told me to meet at the parking

        lot in Brownsville on a certain day and time.

14.     I then stopped looking for other jobs because I had decided that I liked the job terms offered

        by the company in Georgia and had already accepted that offer.

15.     I then prepared to leave my home in Texas to travel to Georgia.

16.     I met with the group of workers recruited by Muñoz in the parking lot where all the farm

        labor contractors meet in Brownsville, Texas.

17.     We had to wait for about two hours before we could leave.  Muñoz told me that we had to

        wait because he was waiting for something to arrive from Plantation Sweets.

18.     Finally, what he was waiting for arrived and we were ready to leave.  I didn't have to pay

-2-

anything for my ticket to get on the bus. But when I got on the bus, I received a receipt for the bus ticket, which cost $75.

19. The bus had "El Expresso" written on the side of it.

20. Muñoz did not ride the bus with us. He drove in a separate car.

21. Everyone who got on the bus was recruited by Muñoz in Texas and was taken to the same place in Georgia.

22. The bus arrived in Georgia the next day. The bus stopped at a gas station and I saw the driver make a phone call. Shortly thereafter, a man with glasses arrived at the gas station and our bus followed him to the Plantation Sweets packing shed.

23. When our bus arrived at the Plantation Sweets packing shed, the bus driver went into an office located at the same shed.

24. Everyone who was traveling on the bus with me from Brownsville got off and formed a line to fill out the registration forms to work at Plantation Sweets.

25. After we registered for work, we got back on the bus and somebody from the Plantation Sweets packing shed took us to housing down the road, where we were told we would be staying. We were also told to wait for Muñoz to arrive. We waited outside under a tree for Muñoz and when he arrived, he told us that we should stay in a green house which was across the street from the trailers.

26. The conditions in the green house, where we spent the night, were poor. It was overcrowded, there was no electricity, and there were no beds or other furniture.

27. The next day, work was still not available and someone in our group went to the Georgia Department of Labor to complain about the housing and the fact that we had no money and

CUtePDF - www.fastio.com

that we needed to eat.

28. After that, we received a $50 loan from Plantation Sweets and we were taken to the Days Inn Motel in Metter, Georgia. We stayed there for one night, which Plantation Sweets paid for. The next day, some of us were taken back to the trailers, where we stayed while we waited for work to begin.

29. Work at Plantation Sweets did not begin until April 19, over a week after we arrived.

30. On April 23, we received our first paycheck. We had been promised an hourly rate of $5.75 per hour, but were paid at only $5.15.

31. We were paid for half of the week on a check drawn from the Plantation Sweets account. The check was handwritten and had no wage stub attached to it explaining the hours or pay rate.

32. On the memo line of the check I received, the letters "Adv" were marked next to the number "125." I saw that $125 had been deducted from my gross pay. I assumed that this amount included $50 for the loan I received and $75 for the transportation costs of the bus.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of June, 2000.

_____
Jesus Garza

SWORN TO and subscribed before me on the 2nd day of June, 2000.

_____
Notary Public, State of Texas

My Commission Expires:

ALCARIO SAMUDIO
Notary Public
STATE OF TEXAS
My Comm. Exp Nov 17, 2000

-4-

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

JESUS GARZA, et al.        :

                       :      CIVIL ACTION NO.  B-00-056

       Plaintiffs,      :

                       :      JURY

vs.                  :

                       :

PLANTATION SWEETS, INC.,    :

                       :

       Defendant.      :

                       :

## AFFIDAVIT

1.    My name is Roberto Garza.  I am over 18 years of age, of sound mind, capable of making this statement, and personally acquainted with the facts contained therein.

2.    I reside in  Brownsville, Texas.

3.    I have worked as a migrant farm worker.

4.    Because I am a migrant farmworker, I often leave my residence in the Rio Grande Valley to go to northern and work in the fields.

5.    Farm labor contractors often come to Brownsville to recruit workers like me to work in states up north.

6.    I often have to rely on what the farm labor contractor tells me about the job.  The employers often make promises about the pay, and whether they will provide us transportation and housing.

7.    If the contractor is able to provide details about the work and provides transportation to that farm, that makes me think that the contractor was sent by the farm to recruit people like me.

8.    In April 1999, I met Arturo Muñoz in Brownsville, Texas.

-1-



9. When I met him in Brownsville, Texas, Muñoz offered me a job in Georgia packing Vidalia onion for Plantation Sweets Inc.

10. When we were in Brownsville, Texas, Muñoz explained the job to me. He told me that there would be work upon arrival packing Vidalia onions; pay at $5.75 per hour and a $.25 bonus upon completion of the season; "A lot of hours," such as ten to twelve hours per day, six days per week; with clean housing in trailers at $5-6 per week, to be deducted from wages.

11. He also told us that there would be free transportation to the work site from Brownsville, because the company had made arrangements for a bus to take us to Georgia and was providing that transportation at no cost.

12. Muñoz did not give me anything in writing which described these conditions of the job.

13. These conditions sounded good to me so I decided to accept the job and told Muñoz that I accepted the job. I gave him my name to write on a list. He told me that I would have to meet him and the other workers at the parking lot in Brownsville on a certain day and time.

14. I then stopped looking for other jobs because I had decided that I liked the job terms that the company was offering and that I had already accepted the job offered by Muñoz.

15. I then prepared to leave my home in Texas to travel to Georgia.

16. I met with the group of workers recruited by Muñoz in the parking lot where Muñoz had told me to meet.

17. We had to wait for about two hours before we could leave.

18. Finally, everything was ready for us to leave. I didn't have to pay anything for my ticket to get on the bus. But when I got on the bus, I received a receipt for the bus ticket, which cost $75.

19. The bus was from the "el expreso" bus company.

20. Muñoz did not ride the bus with us. He drove in a separate car.

21. Everyone who got on the bus was recruited by Muñoz and was taken to the same place.

22. The bus arrived in Georgia the next day. The bus stopped at a gas station and the driver made a phone call. Shortly thereafter, a man with glasses arrived at the gas station and our bus followed him to the Plantation Sweets packing shed.

23. Everyone who was traveling on the bus with me from Brownsville got off there with me and formed a line to fill out and sign the registration forms to work at Plantation Sweets.

24. After we registered for work, somebody from the Plantation Sweets packing shed took us to housing down the road, where we were told we would be staying. We were also told to wait for Muñoz to arrive. We waited outside under a tree for Muñoz and when he arrived, he told us that we should stay in the green house which was across the street from the trailers.

25. The conditions in the green house, where we spent the night, were very bad. There were too many people, there was no electricity, and the beds were inadequate and there was no other furniture.

26. The next day, work was still not available and someone in our group went to complain about the housing and the fact that we had no money to eat.

27. After that, we received a $50 loan from Plantation Sweets and we were taken to the Days Inn Motel in Metter, Georgia. We stayed there for one night, which Plantation Sweets paid for. The next day, some of us were taken back to the trailers, where we stayed.

28. We waited at least a week for work to begin at Plantation Sweets.

29. On April 23, I received my first paycheck. We had been promised an hourly rate of $5.75

-3-

per hour, but they only paid us $5.15.

30.     We were paid for only half of the week on a check drawn from the Plantation Sweets account. The check was handwritten and it did not have a wage stub itemizing the hours we worked, etc.

31.     On the memo line of the check I received, the letters "Adv" were marked next to the number "125." I saw that $125 had been deducted from my gross pay. I assumed that the $125 was for the $50 loan and $75 for the transportation cost on the bus from Brownsville.

_Roberto Garza_
Roberto Garza

SWORN AND SUBSCRIBED BEFORE ME, by the said Roberto Garza, on this ___ day

of June, 2000.

Notary Public in and for the State of Texas

**CERTIFICATE OF TRANSLATION**

I, Alcario Samudio, being fluent in both Spanish and English, do hereby state under penalty of perjury that I literally translated the statements made in this Affidavit from English into Spanish and that Roberto Garza stated to me under penalty of perjury that he fully understood the terms of this Affidavit. Having first so stated, he proceeded to sign his name above.

Alcario Samudio

-4-

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JESUS GARZA, et al.           :

                            :       CIVIL ACTION NO.  B-00-056

       Plaintiffs,      :

                            :       JURY

vs.                        :

                            :

PLANTATION SWEETS, INC.,    :

                            :

       Defendant.      :

                            :

### AFFIDAVIT OF FELIPE ALEJOS

1.     My name is Felipe Alejos.  I am over 18 years of age, of sound mind, capable of making this statement, and personally acquainted with the facts contained therein.

2.     I reside in Brownsville, Texas.

3.     I have worked as a migrant farm worker for over twenty years.

4.     Because I am a migrant farm worker, I often leave my residence in the Rio Grande Valley to go up north and work in the fields.

5.     In my years as a migrant farm worker, I have seen that farm labor contractors come to Brownsville every season to recruit people like me to work in states up north.

6.     It is very common for contractors to recruit workers like me in Brownsville.

7.     As a migrant farm worker, I often have to rely on what I am told verbally about a job up north.  I pay attention to the details of the job, such as how much they are going to pay me and whether transportation and housing will be provided to us.

8.     In April 1999, I met "el cowboy" in Brownsville, Texas, at the Oasis Café.   I later learned that "El cowboy" was a nickname for a man named Arturo Muñoz.

-1-



PLAINTIFF'S
EXHIBIT

3

9.    When I met him in Brownsville, Texas, Muñoz offered me a job in Georgia packing Vidalia onions in a shed for the company Plantation Sweets.

10.    While at the Oasis Café in Brownsville, Texas, Muñoz explained the job to me and my wife. He told us there would be work upon arrival packing onions; pay at $5.75 per hour and a $.25 bonus upon completion of the season; "A lot of hours," such as ten to twelve hours per day, six days per week; and clean housing in trailers at $5-6 per week, to be deducted from wages.

11.    He also told us that there would be free transportation to the work site in Georgia from Brownsville because the company had arranged for a bus to take us to Georgia.

12.    If we didn't want to ride the bus, he said they would reimburse us for the costs of travel and food consumed during travel.

13.    Muñoz did not give us anything in writing which described the terms and conditions that he had explained to us.

14.    These conditions sounded good to me so I decided to accept the job and told Muñoz that I accepted the job. I gave him my name to write on a list. He told me to meet at the parking lot in Brownsville on April 7, 1999 at 8 AM.

15.    I then stopped looking for other jobs because I had decided that I liked the job terms and had already accepted Muñoz's offer to go to Georgia.

16.    I then made preparations to leave my home in Texas to travel to Georgia.

17.    My wife, Martha Alejos, and I decided to drive our own car to Georgia because Muñoz told us that we would get reimbursed for the trip.

18.    We met with the whole group of workers recruited by Muñoz at the parking lot in Brownsville. The ten of us who had decided to travel in our own cars, including myself and

my wife, met at the parking lot too.

19. We needed to know where to go once we arrived in Georgia, so Muñoz wrote on a piece of paper the name of the company, Plantation Sweets, and the name of Ronald, or "Ronnie" Collins, and gave us a map and directions to the Plantation Sweets packing shed.

20. We were waiting there in the parking lot for a few hours when my wife Martha Alejos and I decided to leave. We followed the directions that Muñoz had given to us and drove from Brownsville, Texas to Cobbtown, Georgia.

21. We arrived at the Plantation Sweets packing shed around noon on Thursday, April 8, 1999.

22. The other workers from Brownsville who had come up together on the bus were there, and we all formed a line to fill out the work registration forms.

23. After we registered for work, my wife and I got back in our car and somebody from the Plantation Sweets packing shed led us to a trailer park, where we were told we would be staying. We were also told to wait for Muñoz to arrive.

24. We waited outside under a tree for Muñoz and when he arrived, he told us that we should stay in the green house across the street from the trailers.

25. I asked about the transportation reimbursement. Muñoz told us that we would all have to wait until the next day to get it. We never got reimbursed for what we spent to travel from Brownsville to Georgia.

26. Most of the people who came to Georgia on the bus from Brownsville stayed in the green house. But my wife and I did not want to because it was very crowded and the conditions were bad. The housing was not clean like we were promised.

27. We asked where we could stay and were shown a room in a trailer. The trailer had no water

-3-

or electricity, but we stayed there anyway because we had nowhere else to go.

28.     I remember that some people who were also recruited by Muñoz slept in their car because the conditions were so bad.

29.     The next day, work was not available as was promised. Someone in our group went to complain about the housing and the fact that we had no money to eat.

30.     After someone, we received a $50 loan from Plantation Sweets and we were taken to a motel in a nearby town. I did not pay anything that night. I believe that someone from Plantation Sweets paid for us to stay in the motel.

31.     The next morning, a bus came to the motel parking lot and we were told that trailers were ready. We all went back to the camp but there were not enough trailers, so my husband and I and the eight other workers who had come by car were taken back to the Days Inn. The company paid for this second night as well.



Felipe Alejos

SWORN AND SUBSCRIBED BEFORE ME, by Felipe Alejos, this 7 ᵗʰ day of June, 2000.

> ALCARIO SAMUDIO
> Notary Public
> STATE OF TEXAS
> My Comm. Exp. Nov. 17, 2000

Notary Public in and for the State of Texas

## CERTIFICATE OF TRANSLATION

I, Alcario Samudio , being fluent in both Spanish and English, do hereby state under penalty of perjury that I literally translated the statements made in this Affidavit from English into Spanish and that Felipe Alejos stated to me under penalty of perjury that he fully understood the terms of this Affidavit. Having first so stated, he proceeded to sign his name above.

-4-



PLAINTIFF'S EXHIBIT
3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JESUS GARZA, et al.     :
           : CIVIL ACTION NO.  B-00-056
  Plaintiffs,    :
           : JURY
vs.         :
           :
PLANTATION SWEETS, INC.,  :
           :
  Defendant.    :
_____:

### AFFIDAVIT OF MARTHA ALEJOS

1. My name is Martha Alejos.  I am over 18 years of age, of sound mind, capable of making this statement, and personally acquainted with the facts contained therein.

2. I reside in Brownsville, Texas.

3. I have worked as a migrant farm worker for over twenty years.

4. Because I am a migrant farm worker, I often leave my residence in the Rio Grande Valley to go up north and work in the fields.

5. In my years as a migrant farm worker, I have seen that farm labor contractors come to Brownsville every season to recruit people like me to work in states up north.

6. It is very common for contractors to recruit workers like me in Brownsville.

7. As a migrant farm worker, I often have to rely on what I am told verbally about a job up north.  I pay attention to the details of the job, such as how much they are going to pay me and whether transportation and housing will be provided to us.

8. In April 1999, I met "el cowboy" in Brownsville, Texas, at the Oasis Café.   I later learned that was a nickname for a man named Arturo Muñoz.



PLAINTIFF'S
EXHIBIT

4

9.  When I met him in Brownsville, Texas, Muñoz offered me a job in Georgia packing Vidalia onions in a shed for the company Plantation Sweets.

10. While at the Oasis Café in Brownsville, Texas, Muñoz explained the job to me and my husband. He told us there would be work upon arrival packing onions; pay at $5.75 per hour and a $.25 bonus upon completion of the season; "A lot of hours," such as ten to twelve hours per day, six days per week; and clean housing in trailers at $5-6 per week, to be deducted from wages.

11. He also told us that there would be free transportation to the work site in Georgia from Brownsville because the company had arranged for a bus to take us to Georgia.

12. If we didn't want to ride the bus, he said they would reimburse us for the costs of travel and food consumed during travel.

13. Muñoz did not give us anything in writing which described the terms and conditions that he had explained to us.

14. These conditions sounded good to me so I decided to accept the job and told Muñoz that I accepted the job. I gave him my name to write on a list. He told me to meet at the parking lot in Brownsville on April 7, 1999 at 8 AM.

15. I then stopped looking for other jobs because I had decided that I liked the job terms and had already accepted Muñoz's offer to go to Georgia.

16. I then made preparations to leave my home in Texas to travel to Georgia.

17. My husband, Felipe Alejos, and I decided to drive our own car to Georgia because Muñoz told us that we would get reimbursed for the trip.

18. We met with the whole group of workers recruited by Muñoz at the parking lot in

-2-

CM-PDF - www.fastio.com

Brownsville. The ten of us who had decided to travel in our own cars, including myself and my husband Felipe Alejos, met at the parking lot too.

19.     We needed to know where to go once we arrived in Georgia, so Muñoz wrote on a piece of paper the name of the company, Plantation Sweets, and the name of Ronald or "Ronnie" Collins, and gave us a map and directions to the Plantation Sweets packing shed.

20.     We were waiting there in the parking lot for a few hours when my husband and I decided to leave. We followed the directions that Muñoz had given to us and drove from Brownsville, Texas to Cobbtown, Georgia.

21.     We arrived at the Plantation Sweets packing shed around noon on Thursday, April 8, 1999.

22.     The other workers from Brownsville who had come up together on the bus were there, and we all formed a line to fill out the work registration forms.

23.     After we registered for work, my husband and I got back in our car and somebody from the Plantation Sweets packing shed led us to a trailer park, where we were told we would be staying. We were also told to wait for Muñoz to arrive.

24.     We waited outside under a tree for Muñoz and when he arrived, he told us that we should stay in the green house across the street from the trailers.

25.     I was with my husband when he asked about the transportation reimbursement. Muñoz told us that we would all have to wait until the next day to get it. My husband and I never got reimbursed for what we spent to travel from Brownsville to Georgia.

26.     Most of the people who came to Georgia on the bus from Brownsville stayed in the green house. But my husband and I did not want to because it was very crowded and the conditions were bad. The housing was not clean like we were promised.

-3-

27.   We asked where we could stay and were shown a room in a trailer.  The trailer had no water or electricity, but we stayed there anyway because we had nowhere else to go.

28.   I remember that some people who were also recruited by Muñoz slept in their car because the conditions were so bad.

29.   The next day, work was not available as was promised.  Someone in our group went to complain about the housing and the fact that we had no money to eat.

30.   After someone complained, we received a $50 loan from Plantation Sweets and we were taken to the Days Inn Motel in Metter, Georgia.  I did not pay anything that night.  I believe that someone from Plantation Sweets paid for us to stay in the motel.

31.   The next morning, the bus came to the motel parking lot and we were told that trailers were ready.  We all went back to the camp but there were not enough trailers, so my husband and I and the eight other workers who had come by car were taken back to the Days Inn.  The company paid for this second night as well.

_Martha Alejos_
Martha Alejos

SWORN AND SUBSCRIBED BEFORE ME, by Martha Alejos, this 7th day of June, 2000.

ALCARIO SAMUDIO
Notary Public
STATE OF TEXAS
My Comm. Exp. Nov. 17, 2000

_Notary Public in and for the State of Texas_

CERTIFICATE OF TRANSLATION

I, _Alcario Samudio_ being fluent in both Spanish and English, do hereby state under penalty of perjury that I literally translated the statements made in this Affidavit from English into Spanish and that Martha Alejos stated to me under penalty of perjury that she fully understood the terms of this Affidavit.  Having first so stated, she proceeded to sign her name above.

_Alcario Samudio_

-4-

PLAINTIFF'S
EXHIBIT
4
BASON PRESS, OAKLAND, CA

-5-

CibsPDF - www.fastio.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

APR 11 1990

Jesse E. Clark, Clerk
By Deputy: _____

MARIA LOZANO, MARIA G. LOZANO, )
HORTENCIA G. LOZANO, AND )
PEDRO LOZANO, )
        Plaintiffs )
)
v. )
)
GONYA FARMS, INC., OVERMEYER )
FARMS, AND LUIS P. GOMEZ, )
        Defendants )

CIVIL ACTION NUMBER

M-89-119

## MEMORANDUM AND ORDER

Having come on to be considered the Defendants' Motions to Dismiss for Lack of Jurisdiction or, in the alternative, Motions to Transfer, the Court, based on the pleadings on file and on the arguments of counsel, hereby issues the following ruling.

Plaintiffs Maria Lozano, Maria G. Lozano, Hortencia G. Lozano, and Pedro Lozano (hereinafter "Plaintiffs") are Texas residents who claim to have worked on the Ohio farms of Defendants Overmeyer Farms and Gonya Farms during the 1985 pickle and tomato harvests. Defendant Luis P. Gomez was a migrant worker supervisor for Overmeyer Farms. Plaintiffs initiated this action to recover damages for alleged violations of the Agricultural Worker Protection Act, 29 U.S.C. § 1801, et seq. (hereinafter "AWPA"), relating to wages and working conditions.

Defendants' Motions to Dismiss allege that they are Ohio residents over whom this Court lacks personal jurisdiction. Plaintiffs claim this Court has personal jurisdiction over Defendants under Tex.Civ.Prac.& Remedies Code § 17.042(3), which

PLAINTIFF'S EXHIBIT

5

tabbies®   BASIC PRESS, MALIAN, GA

reads ". . . a nonresident does business in this state if the nonresident (3) recruits Texas residents, directly or through an intermediary located in the state, for employment inside or outside the state." The statute embodies the well-settled rule that before a forum court can assert specific personal jurisdiction over a nonresident defendant who has not consented to jurisdiction, the defendant must have purposeful contacts with the forum state which are related to the cause of action. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985); U-Anchor Advertising, Inc. v. Burt, 553 S.W.2d 760, 763 (Tex. 1977), cert. denied, 434 U.S. 1063 (1978).

To satisfy the jurisdictional prerequisite, Plaintiffs allege that Defendants contacted the Farm Labor Organizing Committee (hereinafter "FLOC") in Ohio, which then recruited employees including themselves through the United Farm Workers (hereinafter "UFW") in San Juan, Texas. All Defendants, on the other hand, maintain by affidavits that they did not contact the FLOC to recruit the Plaintiffs in Texas, nor have they ever recruited employees through an intermediary located in Texas.

Plaintiffs have set out their jurisdictional allegations in two affidavits. First, Maria Elena Ortega, an Ohio FLOC organizer in 1985, states that Defendant Luis P. Gomez contacted her to find harvest workers for Overmayer Farms and Gonya Farms. She told him that workers were available in Texas. At his request, according to the affidavit, she called the UFW in San Juan, Texas, and told Juanita Valdez-Cox of the job

2

opportunities.   She further states that she put the Plaintiffs in contact with Luis P. Gomez when they arrived in Ohio.   Next, Juanita Valdez-Cox confirms in her affidavit that she received a call from the FLOC on behalf of Overmeyer and Gonya Farms and referred the Plaintiffs to the jobs in Ohio.

A party attempting to invoke federal jurisdiction over a nonresident defendant bears the burden of presenting a prima facie case for personal jurisdiction where jurisdiction is determined on the affidavits.   D.J. Investments v. Metzeler Motorcycle Tire, 754 F.2d 542, 545 (5th Cir. 1985).   Plaintiffs' affidavits meet this burden for invoking personal jurisdiction under Tex.Civ.Prac.& Remedies Code § 17.042(3).   The affidavits of Maria Elena Ortega and Juanita Valdez-Cox, if proven, establish that Gonya Farms and Overmeyer Farms through migrant worker supervisor Luis P. Gomez knowingly made employment opportunites available through a UFW office located in San Juan, Texas.

The purposeful act of making employment information available, whether directly or through another party, to an intermediary located in Texas is sufficient to bring the Defendants under the jurisdiction of this Court.   Garcia v. Vasquez, 524 F.Supp. 40, 42 (S.D.Tex. 1981).   An employer being sued for employment practices may, consistent with due process, be subject to personal jurisdiction in the forum in which he recruited employees.   Donovan v. Grim Hotel, 747 F.2d 966, 973 (5th Cir. 1984), cert. denied, 471 U.S. 1124 (1985).

3

Although Defendants' affidavits directly contradict those of Plaintiffs, all conflicts are resolved in favor of the Plaintiffs in determining whether they have presented a prima facie case. D.J. Investments, 754 F.2d at 546. Thus resolving the conflicting affidavits presented by the parties, the Court is convinced that Plaintiffs have carried their burden of establishing a prima facie case that Defendants had purposeful contacts with Texas which are related to this cause of action. Burger King, 471 U.S. at 472.

Defendants request, in the alternative, that the Court transfer this cause of action to the United States District Courts of Ohio. The venue statute for civil actions not founded solely on diversity, 28 U.S.C. § 1391(b), provides that venue is proper "only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law." It is clear that none of the Defendants reside in Texas and that most of the operative facts giving rise to this claim occurred in Ohio. Congress provided, however, in 29 U.S.C. § 1854(a), that any person aggreived by a violation of the AWPA "may file suit in any district court of the United States having jurisdiction of the parties, . . . without regard to the citizenship of the parties. . . ."

This statute permits the Plaintiffs to choose this Court as venue for this cause of action and codifies the significant policy interests behind insuring that migrant workers have access to the judicial system. See Aguero v. Christopher, 481 F.Supp.

4

1272, 1275 (S.D.Tex. 1980). Because this Court, as explained above, has jurisdiction of the parties, it is also a proper venue under 29 U.S.C § 1854(a) and 28 U.S.C. § 1391(b).

It is, therefore, ORDERED, ADJUDGED, and DECREED that the Defendants' Motions to Dismiss or, in the alternative, Motions to Transfer are hereby DENIED.

The Court will order a Docket Control Order be issued in this cause of action. The Clerk shall send a copy of this Memorandum and Order to counsel for the parties.

Done this _10th_ day of April, 1990, at McAllen, Texas.

                          Ricardo H. Hinojosa
                          UNITED STATES DISTRICT JUDGE

TRUE COPY I CERTIFY
ATTEST:
JANE E. CLARK, Clerk
By _____
              Deputy Clerk